(No. 89-CV-0322— )

*In re* APPLICATION OF RONALD D. MANCINI

*Opinion filed November 19, 1993.*
*Opinion on petition for rehearing filed March 11, 1996.*

STEVENS & MCGUIRE (K. THOMAS STEVENS, of counsel), for Claimant.

JIM RYAN, Attorney General (PAUL H. CHO, Assistant Attorney General, of counsel), for Respondent.

## OPINION

JANN, J.

This claim arises out of an incident that occurred on September 29, 1987. Claimant, Ronald Mancini, seeks compensation pursuant to the Crime Victims Compensation Act (hereinafter referred to as the "Act"). 740 ILCS 45/1 *et seq.* (1992).

The Court, after review of the claim and the investigatory report issued by the Attorney General, issued an opinion on July 22, 1989, denying the claim. The Court found that the Claimant and a companion initiated a series of fights with third persons that led to Claimant's injuries. The Court also found that Claimant notified law enforcement officials 11 days after the perpetration of the incident and failed to establish that such notification was timely under the circumstances.

Claimant seeks reimbursement for out-of-pocket medical expenses and loss of earnings. The sum sought is in excess of the maximum award allowed by the Act. Claimant was employed full time by the fire department of the City of Chicago prior to his injury and worked occasionally as a stagehand.

On August 17, 1989, Claimant filed a petition for hearing. A hearing was conducted at which Claimant and a witness on behalf of Claimant, David Sears, testified. Claimant was represented by counsel. Ten exhibits were offered into evidence by the Claimant. All ten were admitted without objection.

Claimant testified, under oath, that on the day in question he and David Sears stopped at a bar to wait for a ride from Claimant's girlfriend. On that day he and Sears had been working as stagehands and he had his tool bag with him. All of the tools possessed by the two were in the tool bags at all times.

The two were at the bar for approximately 30 to 35 minutes and were drinking their second beer when Claimant heard several individuals at the end of the bar making racial slurs. As the Claimant and Sears started to leave the bar, one of the individuals blocked their path. Claimant told the individuals that he and Sears did not want any trouble and only wanted to leave. The individual, whom Claimant later learned was Lavelle Cross, said to "hang around for awhile" or "you ain't going nowhere." Claimant stated that he did not respond to Cross but asked the bartender to call the police and she refused. Another individual, Joseph Pinney, was next to Cross. Neither Claimant or Sears made any aggressive moves towards Cross or Pinney.

Claimant and Sears left the bar several minutes after the verbal exchange. As the two entered the street, Cross and Pinney and a third individual followed them out of the bar. Sears started running and Claimant ran across the street to the Medinah Building to seek some protection. He dropped his tool bag approximately 50 feet from the door to the building and found the doors locked. Cross and Pinney grabbed Claimant by both arms and threw him into and through a plate glass door.

Claimant stated that neither he or Sears held a hammer or any other tool that could be considered a weapon. He did not have a chance to turn around and defend himself or to fight off his attackers. He was knocked unconscious in the attack.

Claimant suffered extremely severe injuries to his left upper extremity which nearly resulted in the loss of the upper extremity and his life. The injury included multiple tendon, artery, nerve and muscle injuries as indicated by Claimant's exhibits.

After the incident Claimant was taken by ambulance to the hospital and received emergency surgery. The day Claimant came out of intensive care, 11 days after the incident, he reported the crime to the police. He was in the hospital three to four weeks. There is evidence that he was receiving vast amounts of pain-killing drugs, i.e., morphine and darvon. Claimant's exhibit number 1 is a letter from Daniel J. Nogles, M.D., in which it is stated that Claimant nearly lost his life and was in no condition to communicate with anyone during the majority of his hospitalization. Based upon the evidence relating to Claimant's physical and mental inability to report the crime because of his injuries, the Court finds that Claimant has established that notification to police was reasonable under the circumstances.

David Sears' testimony corroborated Claimant's version of the incident, and confirmed that he and Claimant were attacked without having provoked the incident.

The Respondent did not produce any witnesses but did tender a 12-page group exhibit purporting to be the October 10, 1987, police report which was admitted into the record without objection.

The Attorney General's investigatory report filed with the Court prior to its July 22, 1989 opinion, included a conclusion that Claimant and a companion verbally harassed one of the offenders, struck the offender with a hammer and initiated another fight. The Court apparently relied upon this factual conclusion, along with the statement in the investigatory report that the conduct of Claimant directly contributed to his injury, in issuing its opinion denying the claim.

During the hearing, the Assistant Attorney General indicated that the Respondent, in preparing and filing the investigatory report, only reviewed the police report arising out of the incident. A review of the police report indicates that approximately seven witnesses were interviewed and the three most relevant are Claimant, Sears and Robert Harris, the night watchman at the Medinah Building. The interview with Harris indicates that Claimant voluntarily left the Medinah Building with a hammer in his hand to face Cross and Pinney. The Harris interview does not directly dispute any other portion of Claimant's testimony.

The police report, except for the interviews with Cross and Pinney, does not tend to prove that Claimant initiated or provoked the altercation. Claimant's exhibit numbers 4 and 5 are certified statements of convictions of Cross and Pinney, respectively, for the offense of battery arising out of the incident.

Based upon the testimony of Claimant and his companion, and the proof of convictions of Cross and Pinney, this Court finds that Claimant did not initiate the altercation and therefore did not directly contribute to his injury.

The issue of reimbursement for certain expenses must now be considered. Claimant's exhibit number 11, purporting to be Claimant's complete financial account from Northwestern Memorial Hospital, was presented. A

review of the exhibit shows that Claimant's hospital bill for the period of September 30 through October 16, 1987, totaled $37,161.40, of which $91.40 was indicated as the sum due from Claimant, the balance being indicated as due from insurance benefits.

Claimant's group exhibit number 7 relates to the medical expenses incurred by Claimant. The first page is a summary of medical expenses totaling $2,557.88. Claimant contends that these expenses were paid out-of-pocket by him and he received no reimbursement. Photocopies of certain checks from Claimant, allegedly indicating the payments, are included in the exhibit.

In reference to the copies of checks the following is noted: (a) the sum of the copied checks is only $1,404.25; (b) a check in the sum of $50 is made payable to CADCO, which is not listed in the summary of medical expenses (pg. 1 of exhibit number 9); (c) there are no copies of checks to Drs. Bell and Stromberg, and to Dr. Maier, although the doctors are listed on the summary; and (d) checks totaling $962.50 include the name "Sonnenberg" in the memo portion of the check. The name "Sonnenberg" also appears on Claimant's 1987 and 1988 individual income tax returns, whereby Claimant declares Donald Sonnenberg and Julene Sonnenberg, no relationship to Claimant, to be his dependents. All checks with the Sonnenberg notation in the memo portion were dated in 1988.

The balance of the documents in Claimant's exhibit number 7, are statements for services including: (a) a Northwestern Medical Faculty Foundation, Inc., statement indicating that on April 26, 1988, a $10 payment was received from Claimant, on July 5, 1988, another $10 payment was received, and on June 6, 1989, a $109 payment was made by Claimant; (b) a June 7, 1990, statement from Drs. Bell and Stromberg indicating $92 was due without

any indication of sums paid by Claimant; (c) an illegible statement; (d) the following statements, all of which are not included in the $2,557.88 sum in Claimant's summary of medical expenses—(i) Consultants in Neurology, Ltd., (ii) an April 24, 1990, statement from Northwestern Memorial Hospital, (iii) a June 9, 1990, statement from Addison Radiology ASSC, SC, and (iv) statements from Our Lady of the Resurrection medical facility, and (e) a statement from DeSilva Center.

The inconsistencies between the summary of medical expenses and supporting documents is tremendous and troubling. It is not logical or reasonable that Claimant would pay a bill attributable to him by placing another person's name in the memo area of the check. Based upon inconsistencies and absence of documentation, and potentially misleading information, the Court could deny Claimant's entire claim for reimbursement of $2,557.88 in medical bills.

In the interest of fairness, and due to the fact that the Attorney General has not filed any objections to the information, Claimant shall be reimbursed $560.75 for the following payments for medical services which are claimed on the summary and are supported by the documents in Claimant's exhibit number 7:

| | |
|---|---|
| Northwestern Medical Faculty Foundation, Inc. | $179.00 |
| Dr. DeBacher | 100.00 |
| Dr. Brandstatter | 125.00 |
| Dr. Bartruck | 55.00 |
| Damon Clinical Labs | 48.75 |
| Diagnostic Radiology Associates | 33.00 |
| Nuclear Medical Associates | 10.00 |
| Evanston North Shore Home Health | 10.00 |
| Total Substantiated | $560.75 |

Claimant seeks an award in excess of the maximum sum permitted by the Act for lost earnings. In support of his claim, he offered exhibit numbers 8 through 11. Claimant presents a theory of "differential" loss. Claimant maintains that his differential in income between his previous full-time salary and the gross benefits he now receives is approximately $20,624.88 less per year. The total loss of wages claimed from the date of the injury to the hearing date is $46,411.23.

Immediately prior to the injury on September 29, 1987, Claimant's gross pay was $2,730 per month and his net pay was $1,860.04 per month as verified by his exhibits.

Exhibit number 8 indicates that Claimant would receive his ordinary disability benefit of $1,009.51 per month from September 29, 1988, to January 17, 1993. Accordingly, Claimant would receive approximately $39,976.60 for that 39.6-month time period. Claimant's gross salary, based upon his pay of $2,730 per month for the same 39.6-month time period would have been $108,381. Pursuant to Claimant's differential loss theory, there is a difference of $68,404.41, between the salary he would have earned as a fireman and the disability benefits he received. This is in excess of the maximum that can be awarded pursuant to the Act. If the differential in earnings were all that would be required to demonstrate a loss of earnings claim under the Act, Claimant would be entitled to the maximum award of $25,000.

Section 2(h) of the Act defines compensable "[P]ecuniary loss" as, *inter alia*, loss of earnings and loss of future earnings because of disability resulting from injury. The same section specifies that an award for loss of earnings or future earnings is to be determined on the basis of the victim's average net monthly earnings for the six months

immediately preceding the date of injury or on $1,000 per month, whichever is less. In this instance, Claimant demonstrated six months of earnings from his primary job as a fireman prior to the date of injury. The sum of $1,000 per month is the lesser amount to be used to calculate earnings loss for Claimant.

Claimant was injured on September 29, 1987, and was earning $2,703.50 per month as an employee of the Chicago Fire Department. He was on personal disability leave from his job for a period of 12 months following the incident and received his earnings in full from the fire department. Therefore, Claimant did not lose any earnings in the 12 months following the injury, except for what he might have earned in his second job as a stagehand. His Federal tax returns indicate that he earned $787 in 1987 and $2,369 in 1988 from his stagehand work. The only conclusion which can be drawn is that he had more earnings from his stagehand job in the calendar year after the incident. No tax return for 1989 was provided. There is insufficient documentation of his earnings from his stagehand work to warrant an award of loss of earnings.

Additionally, it is noted that the 1988 Federal tax return shows he received a $15,000 sum from a Nationwide Life Insurance policy.

On November 30, 1988, 14 months after the incident, the retirement board of Firemen's Annuity and Benefit Fund of Chicago notified Claimant that he was granted ordinary disability benefits in the amount of $1,119.51 a month beginning September 28, 1988, and that he was removed from the Chicago Fire Department payroll effective September 29. The sum of $110 was to be deducted from his benefits for his health insurance premium.

On November 17, 1989, Claimant was notified by the board that he was found unfit for duty and his benefits

would be continued for another year. A July 17, 1990, letter from the board indicates that Claimant would receive a monthly grant of $1,009.51 until January 17, 1993.

Section 2(h) of the Act specifies that the loss of future earnings shall be reduced by any income from substitute work actually performed by the victim or by income he would have earned in available appropriate substitute work he was capable of performing but unreasonably failed to undertake.

Claimant testified that he has had some employment as a stagehand since the date of his injury. His grasp and strength of his left arm do not permit him to work as a stagehand like he did prior to the accident. There is no evidence of other efforts by Claimant in attempting to secure appropriate substitute work.

Claimant's disability benefit does give him less income than his pay from the fire department. But, the claimed loss of future earnings because of his disability needs to be reduced by income earned in available appropriate substitute work he was capable of performing but unreasonably failed to undertake. See section 2(h) of the Act.

Claimant testified that he did some stagehand work after his injury; therefore, it was demonstrated that he was capable of performing some substitute work. He did not demonstrate that he was unable to perform additional substitute work. The finding of disability by the retirement board was that he was unfit for duty as a fireman. There were no findings or proof offered that Claimant is completely and permanently disabled and incapable of performing any work. Claimant has failed to establish that he experienced a loss of earnings making him eligible for an award, after the board granted him ordinary disability benefits effective September 29, 1988.

We find that Claimant's petition for loss of earnings and future earnings is hereby denied. Claimant unreasonably failed to undertake substitute work he was capable of performing, or to demonstrate that he was incapable of performing any work. Claimant did not provide evidence relating to his income in 1989; therefore, he has failed to demonstrate that any sum would be due him for 1989.

It is hereby ordered that Claimant be awarded the sum of $560.75 for medical expenses supported by the evidence. Should Claimant be able to verify additional medical expenses alleged, he may petition the Court for further consideration.

## OPINION

JANN, J.

This cause comes before the Court on a rehearing of Claimant Ronald Mancini's application for compensation pursuant to the Crime Victim's Compensation Act (hereinafter the "Act"). (740 ILCS 45/1 et seq. (1992).) Claimant's application sought compensation in the amount of the statutory maximum of $25,000 for injuries occurring as a result of a September 29, 1987, incident. The Court issued an opinion on November 19, 1993, finding that Claimant was a victim pursuant to the Act and ordering that Claimant be awarded the sum of $560.75 for certain medical expenses.

On December 14, 1993, Claimant filed a petition for rehearing. On March 30, 1994, the Court entered an order granting a rehearing to allow Claimant to supplement the record and give evidence regarding his continuing disability and inability to obtain substitute employment.

At the rehearing, Claimant appeared and testified. Claimant identified and verified that his income for 1989

was $3,023. He described the six stagehand job assignments he had in 1989. He performed more of a supervisory or management position than actual physical labor. He identified his 1991 Federal tax return. He verified five stagehand job assignments and that his income was $3,938. He identified his 1992 Federal tax return. He identified his 1993 Federal tax return, and verified his income as $10,326.

Claimant stated that after his injuries he was unable to perform the requirements of his job as a fireman for the City of Chicago. He returned to the Chicago Fire Department and attempted to regain his position, but was unable to, based upon his physical evaluation. He received extensive physical therapy from Baxter Clinical Health Rehabilitation Center. He estimates that his strength is 45 to 50 percent of what it was before the incident.

Claimant testified the injury has affected his ability to work as a stagehand because it requires a lot of strenuous work, including unloading and loading semis. His condition allows him to function as a manager for stagehand activities.

Claimant explained that he earned more as a stagehand in 1988 ($2,400-$2,500) than in 1987 ($800) because he was working as a fireman in 1987, and was not working as a fireman in 1988. In 1990 he did not have a job. He applied for many different positions with maintenance and lawn care but was unable to get a job. He constantly has pain associated with his injuries in his left elbow to his forefingers and in his three right fingers. His previous employment had been in physically demanding jobs. He had not received any specialized training in any types of occupations, other than to be a fireman or stagehand.

Claimant has applied at delivery services with cars, driving for trucking firms and delivery for maintenance

and janitorial services. He has applied at restaurants for busboy positions, but it is difficult with only one functioning arm.

Claimant identified 12 additional exhibits offered into evidence at rehearing. On the exhibits, which relate to services performed on account of his injuries, Claimant stated:

- a. S-5 is a $494 bill that he personally owes to Illinois Masonic Medical Center;
- b. S-6 is a $39.51 bill he personally owes to Consultants in Neurology;
- c. S-7 is a $109 bill he personally owes to Northwestern Medical Faculty Foundation;
- d. S-8 is a $26 bill he personally owes to Drs. Branch, Statger, Forenz and Thornhill (although he testified he owed them $290);
- e. S-9 is a $15.82 bill he personally owes to OLR Cardiology Services Limited;
- f. S-10 is an $80 bill he personally owes to DeSilva Center;
- g. S-1 is an $899 bill he personally owes to Dr. DeBacher;
- h. S-12 is a $108 bill he personally owes to Nuclear Medical Associates Limited;
- i. S-13 is a $370.35 bill he personally owes to Northwestern Hospital Radiology Group;
- j. S-14 is an $84.70 bill he personally owes to Northwestern Hospital;
- k. S-15 is a $326.65 bill he personally owes to Northwestern Hospital;
- l. S-16 is an $8.25 bill he personally owes to Resurrection Hospital; and
- m. S-17 is a $2,448.90 bill he owes to Drs. Bell, Stromberg, Hanis, Nagel and Widery.

Exhibit numbers S-15 through S-17 were admitted into the record. Claimant identified exhibit number S-18 as copies of bills for cash expenditures made for medication which were admitted into the record.

Claimant testified in relation to Claimant's group exhibit number 7 (admitted in the initial hearing), that Sharon Zoden was the signer of certain checks. She is his "ex." At the time the checks were written he was living with her. Sonenberg was her married name, and Zoden was her maiden name. In relation to the checks with "Sonnenberg" in the memo portion, he stated that Ms. Sonnenberg did not receive any medical care from Surgical Associates in General Surgery (a check in the 300 series) and that the check was in regard to his bill. His testimony in relation to check number 194, check number 152, and check number 180 was consistent with his explanation of the one in the 300 series.

On cross-examination, Claimant acknowledged that 1993 was the only year his adjusted gross income was under $12,000. He is not currently working but is trying to get a landscaping job. He is still under the care of doctors. He did not file a civil suit as a result of the incident.

Claimant was receiving annuity benefits from the fireman's fund until 1993. He has not received those benefits since 1993. On line 17-B of his 1989 tax return, $13,433 was reported from the fireman's annuity. This is his pension. The approximate sums also appear on line 17-B of his 1991 and 1992 Federal tax returns. He received nearly $40,000 in pension payments. In the 1993 Federal tax return the sum of $578 appears because he exhausted the benefits available to him under his pension. He will not receive any retirement payments. He had not filed a 1994 Federal tax return at the time of rehearing.

The first year after the incident, Claimant received full pay from the fire department. Then the retirement board met and determined he was disabled. He began receiving $1,009.58 per month. The retirement board determined each year, through 1992, that Claimant was still unfit to perform the duties of a fireman.

Claimant received $5,000 of unemployment benefits in 1989. None of his medical or hospital creditors represented by exhibit numbers S-5 through S-17 have filed a lawsuit to collect the sums owed.

In relation to the payments made with checks wherein the word "Sonnenberg" was on the memo portion of the check, no bills were provided which would show that services were provided to Claimant. Claimant was instructed that the record would remain open for 30 days after the rehearing and he could file any documents he desired.

Claimant believed that he would have received continuing disability payments and a pension if he had ten years on the fire department. Instead, he only had eight years and the retirement board refunded his pension contributions over three and one-half years. Claimant was granted leave to supplement the record with information from the Fireman's Annuity and Benefit Fund. The Commissioner inquired whether there was any type of work that Claimant could do, *i.e.*, working at a convenience store. It was also suggested that Claimant provide specific information on his efforts at finding a job, *i.e.*, dates and names of companies.

Claimant applied for disability with the Social Security Administration and for supplemental social security but was denied.

On April 12, 1995, Claimant's counsel provided a March 27, 1995 letter from the Retirement Board of the

Fireman's Annuity and Benefit Fund of Chicago, and an affidavit of Claimant, dated April 24, 1995, which stated his efforts to secure employment. The two documents were marked as exhibits and became part of the record. Claimant has not filed a brief.

The March 27, 1995 letter indicates that Claimant was employed by the Chicago Fire Department on February 18, 1980, and was so employed until September 29, 1988, at which time he went on ordinary disability in the amount of $1,199.51 per month through January 16, 1993, when his benefit expired. It states further that this benefit was not a deduction from future benefits nor was it deferred compensation. He was reinstated to the Chicago Fire Department on April 16, 1993, through June 1, 1993, which was his date of discharge. For pension purposes, accumulated service credits amount to 13 years and nine days. As of the date of the letter, Claimant had two options: collect a pension at age 50 in the monthly amount of $475 or take a refund of his contributions in the amount of $39,584.21.

The affidavit provided by Claimant listed 23 different companies where he made efforts toward seeking employment. No dates of when the efforts were made are stated in the affidavit.

## FINDINGS

The record is inconsistent in relation to whether Claimant received disability payments or a return of his pension funds from 1989 through 1993. He testified that it was the return of his pension. However, the documents provided indicate that Claimant was receiving disability payments. In addition, he apparently received unemployment compensation in the sum of $5,000 in 1989, which was at the same time he was receiving disability payments. The State of Illinois may have a claim against him

for a set-off in the amount of unemployment compensation received.

The purpose of the rehearing was to allow the Claimant to supplement the record on his continuing disability and inability to obtain substitute employment. Claimant has supplemented the record, however, we find that Claimant is not entitled to an award for loss of earnings or loss of future earnings. Claimant received his salary or disability payments from the Fireman's Fund in excess of the $1,000 monthly maximum specified in the Act. Claimant applied for disability with the Social Security Administration and for supplemental social security but was denied benefits. More importantly, no expert evidence has ever been provided to indicate that Claimant is now physically unable to work. The purpose of the Act is not to provide relief for persons who are unable to *find* employment after suffering injuries, but is to compensate those persons who are unable to work because of injuries suffered from a violent crime. In this instance, Claimant has not demonstrated that he is unable to find work because of his injuries.

In relation to compensation for medical and hospital expenses, the Court's prior award of $560.75 shall stand. Although the purpose of the rehearing was for consideration of continuing disability and inability to find work, Claimant supplemented the record with 13 different bills/statements from medical and health providers indicating that he still personally owes money. This evidence was not provided in the initial hearing. Exhibit number S-17 indicates that the provider wrote off the amounts owed as a bad debt. All of the other bills/statements are dated six or seven years prior to the hearing date. Although Claimant testified that he still owes those sums, he did not provide any independent evidence that the providers are still seeking payment.

Based upon the evidence provided at the rehearing and documents supplementing the record, the Court's award of $560.75 shall stand and Claimant's requests for additional compensation are hereby denied.